```
                                                              USDC SDNY
                                                              DOCUMENT
UNITED STATES DISTRICT COURT                                  ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK                                 DOC #: _____
------------------------------------------------------------- X   DATE FILED: 8/3/2023
                                                            :
Weilian SHEN, a/k/a Wei Lian Shen, a/k/a Gao Ai             :
Wei, a/k/a "Ah Wei,"                                        :
                                                            :     1:22-cv-8014-GHW
                                              Petitioner,   :     1:4-cr-1205-23-BSJ
                                                            :
                         -against-                          :
                                                            :     MEMORANDUM OPINION &
UNITED STATES OF AMERICA,                                   :            ORDER
                                                            :
                                              Respondent.   :
------------------------------------------------------------- X
```

GREGORY H. WOODS, United States District Judge:

### I. INTRODUCTION

Petitioner Weilian Shen was smuggled into the United States from China in 1998. She has never had legal immigration status in this country. In 2006, Ms. Shen pleaded guilty to two federal counterfeiting offenses. Later that year, she was sentenced to approximately 19 months in prison as a result of her crimes. Her conviction and sentence made her an "aggravated felon"—subject to mandatory removal, and ineligible for asylum in the United States. Ms. Shen claims that she did not know those facts when she entered her guilty plea. Instead, she only learned them years later, in 2022, when she was preparing to apply for asylum. Shortly after she learned those facts—and recognizing that her conviction would stymie her claim for asylum—Ms. Shen filed this petition for the issuance of a writ of error *coram nobis* to vacate her conviction, asserting that her defense counsel had failed to advise her of the immigration consequences of her plea, and that his failure constituted ineffective assistance of counsel. Because the facts asserted in Ms. Shen's petition would support a viable claim for ineffective assistance of counsel, and material issues of fact remain in dispute, the Court must hold an evidentiary hearing to find the relevant facts.

## II. BACKGROUND

### A. Criminal Charges and Conviction

Petitioner Weilian Shen came to the United States in October 1996 in search of economic opportunity. Dkt. No. 5[1] (the "Petition"), Ex. A ("Shen Aff.") at ¶ 1. She had grown up in poverty, and her family could not support her. *Id.* For months, she lived in a rented room with "another person who was smuggled" into the country with her. *Id.* at ¶ 2. Ms. Shen married and had a daughter. Her daughter, born in the United States on January 21, 2000, was an American citizen. Petition Ex. G. But Ms. Shen was not a United States citizen—having been "smuggled" into the country, she had no legal status here.

In 2004, Ms. Shen began to sell fake Louis Vuitton handbags. *Id.* at ¶ 4; *see also* Petition Ex. D at 18:20–19:8. She now excuses her conduct, pointing the blame to her husband. *Id.* ("I was not involved with the conspira[cy] in any way. My husband did not give me living expense[s], so I decided to sell the fake bags that was [sic] laying the house, which were my husband's.").

On November 10, 2004, a grand jury indicted Ms. Shen along with 27 other defendants in a sweeping indictment. Many of the defendants were charged as members of a racketeering conspiracy that had as objects attempted murder and extorsion, among other crimes.[2] Petition Ex. B. Ms. Shen was charged only in Counts Five and Six of the indictment. Those counts charged her with trafficking in counterfeit goods and conspiracy to traffic in such goods in violation of 18 U.S.C. § 371 and § 2320. Petition Ex. B at 21–24.

On November 11, 2004, Ms. Shen was arrested on the charges. *See U.S. v. Shang et al.*, 1:04-cr-1205-BSJ. Ms. Shen hired retained counsel, Joseph A. Schioppi, who represented her throughout

---

[1] "Dkt. No." refers to docket entries in the civil case docket. "Crim. Dkt. No." refers to docket entries in the underlying criminal proceeding.
[2] Ma Yu Dong (last name preceding first name) was one of the defendants in the broader racketeering conspiracy. Petition Ex. B at 1. The Court understands him to be Petitioner's husband as Petitioner's daughter's birth certificate lists her mother as "Wei Liang Shen" and her father as "Yu Don Ma" (last name following first name). Petition Ex. G.

the proceedings following her arraignment. Ms. Shen was arraigned on November 12, 2004. Ms. Shen was detained on consent that day and remained in custody until her sentencing nearly 19 months later.

On April 26, 2006, Ms. Shen appeared before U.S. Magistrate Judge Henry B. Pitman to plead guilty to both of the charges against her in accordance with a plea agreement that had been negotiated with the United States. Petition Ex. D ("Plea Tr."). Ms. Shen discussed the plea deal with her lawyer, Mr. Schioppi, before she accepted the plea. In the affidavit presented to the Court in connection with the Petition, Ms. Shen asserts that before she pleaded guilty, Mr. Schioppi advised her that "the earlier [she] plead guilty, the earlier [she] would be let home and see [her] daughter." Shen Aff. at ¶ 5. Ms. Shen also avers that Mr. Schioppi did not even "mention anything about immigration consequences if I were to plead guilty to the charges." *Id.* at ¶ 6. She states that "[i]f I had known the charge meant mandatory deportation, I would not have pleaded guilty so easily. *Id.* At this point, her daughter was six years old, and Ms. Shen affirms that "all I wanted was to get back to her as soon as possible." *Id.* at ¶ 7. Ms. Shen states that she had "planned to stay with her in the United States for the rest of my life, and my daughter is a United States citizen—there is no way she could go back to China to reside with me." *Id.* "Had I known that my plea would ensure our permanent separation I never would have accepted it." *Id.*

Mr. Schioppi presented a declaration to the Court together with the Government's opposition to the Petition. Dkt. No. 19-1 ("Schioppi Aff."). In his declaration, Mr. Schioppi paints a different picture of the advice that he provided to Ms. Shen in advance of her plea. In his declaration, Mr. Schioppi acknowledges that he has no independent recollection of Ms. Shen's case. However, he asserts that for the last twenty years it has been his practice to advise clients whom he believes may not have legal status in the United States "that a guilty plea may and in fact probably will result in adverse immigration consequences." *Id.* at ¶ 4–5. Therefore, he believes that he would

3

have advised Ms. Shen that her guilty plea "may and likely would result in adverse immigration consequences." *Id.* at ¶ 6.

Ms. Shen decided to accept the plea offer. At the plea hearing, Judge Pitman conducted a thorough Rule 11 colloquy. *See generally* Plea Tr. Ms. Shen's immigration status was discussed during the colloquy. The court inquired about Ms. Shen's citizenship status in the following exchange:

> THE COURT: Ms. Shen, a guilty plea can also have immigration consequences for individuals who are not citizens of the United States, and because of them, let me ask you: Are you a citizen of the United States?
>
> THE DEFENDANT: No.
>
> THE COURT: Do you understand that one of the other consequences, one of the additional consequences of your guilty plea is that you may be deported or removed from the United States, and you may be prohibited from ever reentering the United States? Do you understand that's another consequence of your guilty plea?
>
> THE DEFENDANT: Yes.

*Id.* at 17:22–18:9. Judge Pitman accepted Ms. Shen's guilty plea, and recommended that District Judge Barbara Jones, who was presiding over the case, do the same. *Id.* at 29:8–16.

Judge Jones sentenced Ms. Shen on June 23, 2006. Ultimately, Judge Jones imposed a term of imprisonment of "time-served"—the approximately 19 months that Ms. Shen had been in prison since her arrest. Petition Ex. E ("Sentencing Tr.") at 4:20–5:10. During the sentencing hearing, the Court and the defense engaged in the following colloquy touching on Ms. Shen's immigration status:

> THE COURT: All right. The guideline range in this range is 18 to 24 on a plea. It's usually my practice, barring unusual circumstances, to go to the bottom of the guideline range. And so I think honestly in this situation time served is the appropriate sentence. However, let me ask you, Mr. Schioppi, if there's anything that you would like to say at this time with respect to the sentence at all?
>
> MR. SCHIOPPI: I would concur with your Honor's estimation based on reviewing the report and the plea agreement in this case also, Judge. Basically, you're dealing with a 32-year-old woman here who's had no prior conflict with the law, and has a young child, six-and-a-half-year-old child. And she's expressed to me, and I know she's expressed to probation, that she hasn't been able to see her child for the last year and-a-half or so because of her incarceration.

4

> THE COURT:  All right. Ms. Wei Lian Shen, is there anything that you would like to say to the Court before I pass sentence on you?
>
> THE DEFENDANT:  I hope your Honor will let me stay here to be with my daughter.
>
> THE COURT:  All right.  I do not make decisions about whether or not people are permitted into the country or are allowed to stay in the country.  My job right now is to sentence you for the two crimes that you pled guilty to, and I'm going to do that. I am going to give you time served, as I just mentioned, which means that that will finish your prison term.  I do not know what will happen with respect to the immigration authorities.  They will make their own decision.  I don't know whether they will deport you or what will happen.  So I can't give you any answer with respect to that.  But at this time, let me pass sentence.

*Id.* at 3:5–4:13.  Judge Jones later reiterated, "I do not know, as I said earlier, what will happen with the defendant with respect to the immigration authorities." *Id.* at 5:11–12.  Following completion of her sentence, for reasons unknown to the Court, Ms. Shen was not detained for further immigration proceedings notwithstanding her immigration status and the fact that she had been convicted of a so-called "aggravated felony."  She was released.

Ms. Shen did not appeal her conviction and sentence, which fell within the anticipated sentencing guidelines range.  Nor did she seek other collateral relief.

### B. Asylum Application

In 2017, over ten years after her conviction, Ms. Shen was introduced to Christianity by a friend.  Shen Aff. at ¶ 8.  Knowing that she had no legal status in the United States, and fearing religious persecution in China were she to be deported, Ms. Shen filed an application for asylum on January 23, 2018.  *Id.*  In August of 2022, while preparing for a preliminary hearing regarding her asylum application, Ms. Shen's attorneys discovered that her conviction for counterfeiting constituted an "aggravated felony" as defined by the Immigration and Nationality Act.  8 U.S.C. §§ 1101(a)(43)(R) (defining an aggravated felony as one "relating to . . . counterfeiting . . . for which the term of imprisonment is at least one year . . . .").  Not unjustifiably, Ms. Shen affirms that her

5

conviction renders her ineligible for asylum. Shen Aff. at ¶ 9; *see* 8 U.S.C. §§ 1158(b)(2)(A)(ii), (b)(2)(B)(i).

At the preliminary hearing held on September 12, 2019, the presiding Immigration Judge noted that Shen's criminal history might present an obstacle to her asylum petition. *Id.* at ¶ 9.

### C.    Procedural History

Shortly after her preliminary asylum hearing, on September 20, 2022, Ms. Shen initiated this action seeking the issuance of a writ of *coram nobis* to vacate her conviction. Dkt. No. 1. Vacatur of the conviction is the only pathway that she perceives that may permit her to obtain legal status in the United States. On September 21, 2022, she filed an amended petition, which is at issue here.

In her Petition, Ms. Shen argued that the writ should issue because she received ineffective assistance of counsel from her lawyer, Mr. Schioppi. In particular, she asserted that Mr. Schioppi's representation was deficient because he provided her with no advice about the immigration consequences of her plea. Moreover, according to Ms. Shen, he gave her affirmatively inaccurate advice when he advised her that the sooner she pleaded guilty, the sooner she would be able to return home to see her daughter. Because she was accepting a plea to an aggravated felony, she suggests, she should have been informed at the time that "deportation today is an essentially certain, automatic, and unavoidable consequence of an alien's conviction for an aggravated felony." *United States v. Couto*, 311 F.3d 179, 189–90 (2d Cir. 2002). Ms. Shen also argued that had she known of the immigration consequences of her plea, and the likelihood of her deportation and separation from her daughter, she would not have accepted the plea.

Because Ms. Shen raised issues regarding the nature of the advice provided to her by Mr. Schioppi, the Court requested that Ms. Shen waive her attorney-client privilege with respect to the substantive communications between her and Ms. Schioppi. Dkt. No. 17. Ms. Shen waived her attorney-client privilege on November 15, 2022. Dkt. No. 18.

The Government filed its opposition to the Petition on December 15, 2022. Dkt. No. 19 ("Opp."). The Government supported its opposition with a declaration by Mr. Schioppi with respect to the communications that he had with Ms. Shen regarding the immigration consequences of her plea, as detailed above. In its opposition, the Government argued first that Ms. Shen's Petition failed to demonstrate that Mr. Schioppi's performance was deficient. Opp. at 8-12. This argument rested in part on the Government's contention that the Court should credit Mr. Schioppi's recollection of the advice that he likely provided to Ms. Shen—namely that he likely advised her that her guilty plea "may and likely would result in adverse immigration consequences"—rather than Ms. Shen's version of events—that he provided no immigration advice to her at all prior to her plea. *Id.* at 9-10. The Government argued that the advice that Mr. Schioppi asserts he likely provided would not have been reasonable at the time of Ms. Shen's plea. That is because, the Government argued, the Supreme Court's decision in *Padilla v. Kentucky,* 559 U.S. 356 (2010), establishing that criminal defense attorneys have an affirmative obligation to advise a client of the immigration consequences of a plea and conviction, did not apply at the time of Ms. Shen's plea. *Id.* at 9-10.

The Government also argued in its opposition that Ms. Shen was not prejudiced by any deficient counsel provided by Mr. Schioppi. Here too, the Government asked the Court to rest its determination in part on a finding of fact. The Government asserted that Ms. Shen's "own sworn statements from the plea hearing contradict her current claim that she did not understand the potential immigration consequences of her guilty plea." *Id.* at 15.

And, finally, the Government argued that Ms. Shen's Petition was not filed timely. The Government argued that "the record belies" Ms. Shen's assertion that she did not realize until shortly before she filed her Petition that her conviction would prevent her from regularizing her immigration status. *Id.* at 16-17. The Government contended that the record supported the conclusion that Ms. Shen was aware of the issue well before then. The Government argued that the

7

proper benchmark should be the date of her 2006 plea, or, alternatively, the date on which Ms. Shen applied for asylum in 2018. *Id.* at 16. If those were the benchmark dates, the Government argued, Ms. Shen's 2022 filing came too late. The issue was fully briefed on December 20, 2022, when Ms. Shen filed her reply. Dkt. No. 20.

### III.  LEGAL STANDARD

"The writ of coram nobis is an ancient common-law remedy designed 'to correct errors of fact.'" *United States v. Denedo*, 556 U.S. 904, 910 (2009) (quoting *United States v. Morgan*, 346 U.S. 502, 507 (1954)). "In federal courts the authority to grant a writ of coram nobis is conferred by the All Writs Act, which permits 'courts established by Act of Congress' to issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'" *Id.* at 911 (quoting 28 U.S.C. § 1651(a)).

"'A writ of error *coram nobis* is an extraordinary remedy' typically granted only when a prisoner is out of custody and so cannot pursue habeas relief." *Doe v. United States*, 915 F.3d 905, 909 (2d Cir. 2019) (quoting *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014)). "*Coram nobis* is 'not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid.'" *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000) (*quoting Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996)).

"To receive *coram nobis* relief, a petitioner must show 'that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ.'" *Doe*, 915 F.3d at 910 (quoting *Kovacs*, 744 F.3d at 49). "The proceedings leading to the petitioner's conviction are presumed to be correct, and "the burden rests on the accused to show otherwise." *Foont*, 93 F.3d at 78–79 (quoting *United States v. Morgan*, 346 U.S. 502, 512 (1954)). Thus, "the bar for succeeding on such a writ is a high one, first because great

respect is placed upon the finality of judgments, . . . and second, because 'a court must presume that the proceedings were correct, and the burden of showing rests on the petitioner.'" *United States v. Hernandez*, 283 F. Supp. 3d 144, 149 (S.D.N.Y. 2018) (quoting *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998)).

A petitioner is entitled to a hearing on a writ of error *coram nobis* "only if his petition alleges facts which would support a claim of deprivation of constitutional right, and some material issue of fact is in dispute." *U.S. v. Tribote*, 297 F.2d 598 (2d Cir. 1961); *see also U.S. v. Carlino*, 400 F.2d 56, 59 (2d Cir. 1968) (noting that the petitioner "would be entitled to an evidentiary hearing only if he raised a material issue of fact on a claim of constitutional dimensions").[3] "[T]his Court must, in deciding whether [petitioner] is entitled to a hearing, assume the facts alleged to be true," but is not "obliged to accept as facts mere conclusory allegations." *Tribote*, 297 F.2d at 601; *see also U.S. v. Wolfson*, 558 F.2d 59, 65 (2d Cir. 1977) (denying hearing on a writ of *coram nobis* when "appellant's petition presented little, aside from his own speculations, in support of a claim").

## IV.   DISCUSSION

The Court must hold an evidentiary hearing to determine the facts underpinning Ms. Shen's Petition because she asserts facts that would give rise to a viable claim of deprivation of a constitutional right and the parties dispute material issues of fact. If credited, the facts asserted by Ms. Shen would support a viable claim that Ms. Shen filed the Petition timely and that she was deprived of a constitutional right.

---

[3] Some courts in this circuit have analogized the writ of error *coram nobis* to *habeas corpus* petitions and adopted modified versions of the § 2255 standard to determine if evidentiary hearings are warranted. For example, in *U.S. ex rel. Delman v. Butler*, the court wrote that "in accord with the general rule in federal habeas corpus regarding the holding of evidentiary hearings," "'when the record conclusively demonstrates the falsity of the allegations and there is no reasonable probability at all that defendant's averments are true' no coram nobis hearing is required." 390 F. Supp. 606, 610 (E.D.N.Y. 1975) (quoting *People v. Guariglia*, 303 N.Y. 343 (338, 102 N.E.2d 580)).

### A.     Timeliness of *Coram Nobis* Petition

Ms. Shen's Petition asserts facts that support a viable claim that the Petition was filed in a timely manner. A petition for a writ of error *coram nobis* is not governed by any statute of limitations. *See Foont v. U.S.*, 93 F.3d 76, 79 (2d Cir. 1996). "However, an error of constitutional dimension at the time of plea or sentence renders a conviction voidable, not void, and coram nobis relief may be barred by the passage of time." *Id.* In order "[t]o receive *coram nobis* relief, a petitioner must show 'that . . . sound reasons exist for failure to seek appropriate relief.'" *Doe*, 915 F.3d at 910 (quoting *Kovacs*, 744 F.3d at 49). The Second Circuit has interpreted the requirement that a petitioner show "sound reasons" for delay in filing a petition "as calling to the attention of the district court the circumstances surrounding the petitioner's failure to raise the issue earlier rather than the government's injury that resulted from the delay." *Foont*, 93 F.3d at 80. "The critical inquiry, then, is whether the petitioner is able to show justifiable reasons for the delay." *Id.* "A district court considering the timeliness of a petition for a writ of error coram nobis must decide the issue in light of the circumstances of the individual case." *Id.* at 79.

The facts presented by Ms. Shen in support of her Petition are similar to those considered by the Second Circuit in *Kovacs v. U.S.*, 744 F.3d 44 (2d Cir. 2014). In that case, the petitioner, Mr. Kovacs, asked his lawyer to negotiate a plea deal that would have no immigration consequences. *Id.* at 48. Mr. Kovacs entered a guilty plea in 1999 at a hearing in which the district court warned him "that immigration consequences were not in its control." *Id.* Mr. Kovacs was sentenced to probation and travelled internationally for years—until 2009, when immigration officials questioned his eligibility for reentry into the United States as a result of his conviction and scheduled him for an interview to evaluate his immigration status. *Id.* at 49. Mr. Kovacs discussed his options at that time with his counsel, "but allegedly none of them advised him to seek vacatur of his conviction." *Id.*

10

"[N]otwithstanding his efforts to seek counsel earlier, [Mr. Kovacs] first became aware of the possibility of *coram nobis* relief in October 2011." *Id.*

On those facts, the Second Circuit determined that Mr. Kovacs had "supplied sufficient reasons to justify the delay" and that his petition for the issuance of a writ of error *coram nobis* was timely because he had averred that he "was unaware that a writ of *coram nobis* existed" until shortly before contacting the government. *Id.* at 54. The court reasoned that "it is improbable that Kovacs (or whatever attorney he consulted) would have promptly thought about *coram nobis*, which is as arcane as it is ancient." *Id.* So, in *Kovacs*, the Second Circuit accepted the proposition that a petitioner's recent discovery of the availability of the writ of *coram notice* could make a petition timely more than a decade after the petitioner's conviction, and three years after he first sought legal advice about his immigration status.

The facts that Ms. Shen asserts parallel those considered by the Second Circuit in *Kovacs*. As in *Kovacs*, Ms. Shen asserts that she had no awareness that the possibility for *coram nobis* relief existed or that she had a basis for the petition until at least August 2022, after which she promptly filed her Petition. *Kovacs*, 744 F.3d at 54 (explaining that a petitioner "supplied sufficient reasons to justify the delay" when he averred that he "was unaware that a writ of coram nobis existed" until shortly before filing). The Government contends that Ms. Shen was aware of the facts underlying her Petition earlier than August 2022. But *Kovacs* teaches that the brief colloquy regarding Ms. Shen's immigration status at the time of her guilty plea, and her decision to apply for asylum in 2018 do not bar a finding that her Petition is timely. These competing factual narratives are best resolved through an evidentiary hearing.[4]

---

[4] In *Kovacs*, the Second Circuit resolved the timeliness issue in favor of the petitioner without the need for an evidentiary hearing, while noting that "[w]hen such a disputed issue of fact arises, we typically remand for a hearing." *Kovacs v. United States*, 744 F.3d 44, 54 (2d Cir. 2014). The Second Circuit disclaimed the need for an evidentiary hearing because it concluded that it was "improbable that Kovacs (or whatever attorney he consulted) would have promptly thought about *coram nobis*, which is as arcane as it is ancient." *Id.* Because an assessment of the probability of such an

11

### B. Ineffective Assistance of Counsel

Ms. Shen's Petition asserts facts that would support a viable claim for ineffective assistance of counsel. "'Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process.'" *Kovacs*, 744 F.3d at 49 (quoting *Lafler v. Cooper*, 132 S.C. 1376, 1384 (2012)). Therefore, "ineffective assistance of counsel is one ground for granting a writ of *coram nobis*." *Id.* "A claim of ineffective assistance entails a showing that: 1) the defense counsel's performance was objectively unreasonable; and 2) the deficient performance prejudiced the defense." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).

Ms. Shen's Petition asserts facts that would permit the Court to find that Mr. Schioppi's representation of her was objectively unreasonable. At the outset, the Court acknowledges that the categorical rule announced by the Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010), does not apply here. In *Padilla*, the Court concluded that "counsel must advise her client regarding the risk of deportation." *Id.* at 367. "The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." *Id.* at 369. In *Chaidez v. United States*, 568 U.S. 342 (2013), the Supreme Court held that *Padilla*'s holding did not apply retroactively, "so that a person whose conviction became final before we decided *Padilla* can benefit from it." *Id.* at 344. But that is not the end of the story. The Supreme Court emphasized in *Padilla* that the "weight of prevailing professional norms" existing before *Padilla* was decided "supports the view that counsel must advise her client regarding the risk of deportation." *Padilla*, 559 U.S. at 367.

---

understanding could be viewed as requiring a finding of fact, as a trial court, the Court believes that the prudent course is to take what the Second Circuit described as the "typical" course—to hold a hearing to determine to the predicate facts. Moreover, the Court cannot conclude that the publication of the Second Circuit's decision in *Kovacs* would not by itself make it much more probable that counsel would consider the availability of *coram nobis* as a remedy following the publication of the decision in 2014.

12

And there was substantial authority in the Second Circuit at the time of Ms. Shen's plea that supported the proposition that failure by a defendant's counsel to adequately advise her of the immigration consequences of her plea could be found to be objectively unreasonable. For example, in *U.S. v. Couto*, the court of appeals held that an "affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable" and "meets the first prong of the *Strickland* test" for ineffective assistance of counsel." *U.S. v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002). The court held that because "an alien convicted of an aggravated felony is automatically subject to removal and no one—not the judge, the [immigration agency], nor even the United States Attorney General—has any discretion to stop the deportation," ambiguous statements by counsel such as "there were many things that could be done to prevent [an aggravated felon] from being deported" constituted an affirmative misrepresentation that would permit a finding that counsel's performance was objectively unreasonable. *Id.* at 183, 191; *see also Michel v. U.S.*, 507 F.2d 461, 465 (2d Cir. 1974) ("Where his client is an alien, counsel and not the court has the obligation of advising him of his particular position as a consequence of the plea").

Applying the law in effect at the time of Ms. Shen's guilty plea, Ms. Shen's Petition raises a viable basis for the Court to conclude that Ms. Shen was deprived of the effective assistance of counsel. Ms. Shen attests that "[t]he attorney did not mention anything about immigration consequences if I were to plead guilty to the charges," Shen Aff. ¶ 6, and that Mr. Schioppi did not "advise the Court at sentencing of the critical one-year cutoff, beyond which Petitioner's conviction would make her an aggravated felon under 8 U.S.C. § 1101(a)(43)(R)." Petition at 7. Additionally, Ms. Shen swears that she pleaded guilty on the advice of her attorney, who had advised her that "the earlier [she] plead guilty, the earlier [she] would be let home to see [her] daughter." Shen Aff. at ¶ 5. If credited, the last of these statements alone presents a viable basis for Ms. Shen's claim. It could be viewed as an affirmative misrepresentation by her counsel regarding the immigration

13

consequences of her plea: as a convicted aggravated felon, she might not be sent home to see her daughter following her period of incarceration, but, rather, be turned over to immigration authorities for deportation.

Ms. Shen has averred sufficient facts to support a viable claim that she was prejudiced by Ms. Schioppi's allegedly deficient counsel. Ms. Shen asserts that "[her] daughter was only four years old at that time, all [she] wanted was to get back to her as soon as possible[,]" that "[h]ad [she] known that [her] plea would ensure [their] permanent separation [she] never would have accepted it." *Id.* at ¶ 7. Ms. Shen's present narrative is supported by her statement to Judge Jones during her sentencing: "I hope your Honor will let me stay here to be with my daughter." Sentencing Tr. at 3:25–4:1. In response, the Government presents an alternative factual narrative, arguing that Ms. Shen has not "placed sufficient emphasis on the immigration consequences of her plea to establish prejudice." Opp. at 15. Instead, the Government contends, Ms. Shen's "primary goal at the time of the guilty plea was to be released from prison so that she could be with her daughter," and that "her guilty plea reflects a strategic choice to take a calculated risk that she would be able to stay in the country." *Id.* The Government's argument raises a disputed material issue of fact. Because Ms. Shen's facts, if true, "support a claim of deprivation of a constitutional right," the Court must hold an evidentiary hearing to resolve the dispute. *Tribote*, 297 F.2d at 600.

The Government's argument that Ms. Shen's plea colloquy cured any ineffective assistance by her counsel is not supported by the record before the Court. In *Marte v. United States*, Judge Marrero concluded that the plea colloquy in that case cured any prejudice that may have resulted from his counsel's inadequate representation. *Marte v. United States*, 952 F. Supp. 2d 537, 541 (S.D.N.Y. 2013) ("Even if Marte's trial counsel failed to inform him of the deportation consequences, Marte fails to show prejudice because he affirmed his understanding of the deportation implications of his guilty plea during the plea allocution."). The Court agrees that a plea

colloquy that establishes the defendant's "understanding of the deportation implications of his guilty plea" may be sufficient to defeat a showing of prejudice.

However, the Court cannot conclude on this record that the plea colloquy in this case on its own established Ms. Shen's understanding of the deportation implications of her guilty plea. That is because the conditional language used by Judge Pitman during the plea colloquy may not have been sufficient to make clear that her plea made her removal presumptively mandatory. During her plea colloquy, Judge Pitman asked Ms. Shen if she "understood that consequences of your guilty plea is that you *may* be deported or removed from the United States, and you may be prohibited from ever reentering the United States . . . ." Plea Tr. 17:22–18:9 (emphasis added). Ms. Shen said that she did. But Ms. Shen's acknowledgement that she "may" be removed as a result of her plea does not establish that she understood the immigration consequences of her plea. Those implications were arguably substantially more severe than the word "may" suggested: her removal was presumptively automatic.[5] As a result, the Court cannot conclude that she fully understood the immigration consequences of her plea from the transcript of her plea hearing alone. An evidentiary hearing is warranted in order to establish a complete record.

V. **CONCLUSION**

There are disputed material issues of fact in this case. The Court must hold an evidentiary hearing to establish a factual record upon which to evaluate the merits of Ms. Shen's Petition. The parties are directed to write a joint letter the Court no later than August 15, 2023. The letter should

---

[5] The Government points the Court to *Chowdhary v. United States*, No. 11 CR. 859 JGK, 2015 WL 273728 (S.D.N.Y. Jan. 22, 2015), which involved a plea colloquy using similarly conditional language. However, in that case, the court did not rely on the plea colloquy alone to reach the conclusion that the defendant was aware of the immigration consequences of the plea. *Id.* at *5 ("Chowdhary also cites the Court's statement that deportation was a 'possible consequence' of his guilty plea, and argues that the Court should have advised Chowdhary that deportation was mandatory. However, Chowdhary's argument is contradicted by evidence in the record. The Plea Agreement stated that it is 'very likely' that deportation would be 'presumptively mandatory' as a result of Chowdhary's guilty plea. Chowdhary acknowledged that he read and understood the Plea Agreement, that he understood that his conviction could be used to remove him from the United States, and that he had spoken with his counsel about immigration consequences.").

inform the Court regarding the anticipated length of the evidentiary hearing, and propose dates during which the parties and their respective witnesses will be available. The Court expects that it will schedule a conference with the parties to discuss the structure and timing of the hearing after it receives their letter.

    SO ORDERED.

Dated:  August 3, 2023
New York, New York

                                  GREGORY H. WOODS
                                  United States District Judge